**JASON D. LAMM # 018454**
Law Office of Jason Lamm
2501 North Seventh Street
Phoenix, AZ  85006-1047
Telephone: (602) 222-9237
Facsimile: (602) 222-2299
Email:  jlamm@cyberlawaz.com

**JEFFREY H. JACOBSON # 019502**
Jacobson Law Firm
570 N. Columbus Blvd., Ste. B
Tucson, AZ  85711-2972
Telephone: (520) 834-8034
Facsimile: (520) 844-1011
Email:  jeff@jacobsonlawfirm.net
Attorneys for Defendant BROWN

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **United States of America**, | Case No.: 2:24:cr-00355-SPL |
| Plaintiff, | **DEFENDANT'S MOTION TO SUPPRESS STATEMENTS** |
| vs. | |
| **Larry Edward Brown, Jr.**, | **Evidentiary Hearing Requested** |
| Defendant | |

Defendant, through undersigned counsel, hereby moves this Court to enter an Order suppressing statements made by Defendant to Federal Bureau of Investigation Special Agent Taylor Hannah (Hannah) while he was undergoing medical treatment at Honor Health Sonoran Crossing Medical Center (SCMC) located at 33400 N. 32nd Avenue in Phoenix.

**I.      Statement of Pertinent Facts**

As the Court is painfully aware, Defendant is alleged to have caused the death of his co-worker and dear friend on 17 August, 2023.  No party can reasonably dispute that Defendant was devastated after the shooting.  He cried, prayed with other law enforcement officers who were on scene, and was generally not doing well after the incident.

After the Victim was transported to a trauma center at which he later passed away, one of the Defendant's colleagues prudently took him to SCMC to be evaluated by medical personnel as he appeared to be in shock and amid a mental health crisis.  Per medical records disclosed by the Government, Defendant arrived at SCMC at about 1305 hours and was admitted at 1312 hours.  When he was triaged, he had an elevated heart rate and blood pressure – as was the case throughout the entirety of his hospitalization.  Defendant was placed in a private room with a door for medical treatment.  Defendant did not leave his room until he was discharged at 1814 hours with a final diagnosis of an acute stress reaction.

Defendant was initially seen by a physician at 1323 hours with a chief complaint of "emotional shock" who expressed concerns of Defendant experiencing post-traumatic stress disorder.  He was given intravenous fluids, anti-nausea medications, and a benzodiazepine in efforts to calm him in light of his mental state and the horrific events that occurred that day.  The benzodiazepine was administered intravenously at 1548 hours after Defendant was informed of the Victim's passing given the unsurprising effect that receiving such news had on him.

Per her narrative report drafted on 25 August, 2023, Hannah responded to SCMC at approximately 1320 hours.  She and Defendant had no prior

personal relationship. Numerous other law enforcement officers were already present.   Hannah went into Defendant's room, where she encountered his friend and immediate supervisor, IRS SA Tina DeAndre.  DeAndre informed Hannah that neither she nor Defendant would be speaking to Hannah or the FBI at that time.  Hannah made clear that she was not present in a supportive or collegial capacity, but rather as part of an official investigation.  Defendant's wife entered his room at 1345 hours and remained with him, save for brief moments when she stepped out to make phone calls.  The wife spoke to Hannah outside Defendant's presence and related that Defendant was verbally expressing suicidal ideation.

      Hospital employees marshaled Hannah and other law enforcement officers out of, and away from Defendant's private hospital room and into a conference room.   SCMC personnel further directed them to stay in the conference room so as to not disrupt normal hospital operations, or to cause patient care and privacy to be disrupted.  The defense will present witnesses who will testify that Hannah repeatedly disregarded this directive and repeatedly entered Defendant's private room where he was receiving medical treatment.  At no time that day was a warrant ever obtained to secure any evidence from Defendant or his private hospital room.  Hannah left SCMC at 1640 hours to conduct other investigation related to the incident.

      On 31 August, 2023, Hannah authored a second written report which stated that while she was at the hospital, she purportedly heard Defendant spontaneously state "I am a Use of Force Instructor.  I should know better.  I teach this."  Taylor's report does not indicate at what time these statements were allegedly made, nor has the Government disclosed any handwritten notes that she used to assist her in writing her (second) report some two

weeks after the incident occurred.  It appears that the statements of Defendant were not recorded or otherwise contemporaneously memorialized.  The Government has not disclosed the reports of any other agent or officer which purports to confirm Defendant's alleged statements.

Additional facts may be supplemented herein.

## II.     Law and Argument

It is axiomatic that the Government bears the burden of proving by a preponderance of evidence that a defendant's statements were voluntary for them to be admissible at trial.  *See  Lego v. Twomey*, 404 U.S. 477, 489 (1972);  *United States v. Tingle*, 658 F.2d 1335 (9th Cir. 1981).  Among the factors that the District Court must consider in evaluating the voluntariness of a defendant's statements include, but are not limited to his physical and mental condition, the length and location of the interrogation, and whether the defendant was properly advised of his *Miranda* rights.  *Withrow v. Williams*, 507 U.S. 680, 693-94 (1993).

18 U.S.C. § 3501(b) provides:

> The trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession, including (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

> The presence or absence of any of the above-mentioned factors to be taken into consideration by the judge need not be conclusive on the issue of voluntariness of the confession.

### A.   **Defendant Had a Reasonable Expectation of Privacy**

"[A] criminal defendant may invoke the protections of the Fourth Amendment only if he can show that he had a legitimate expectation of privacy in the place to be searched or the item seized." *United States v. Ziegler,* 474 F.3d 1184, 1189 (9th Cir. 2007). "An expectation of privacy is legitimate if it is one which society accepts as objectively reasonable." *United States v. Thomas*, 447 F.3d 1191, 1196 (9th Cir. 2006). "[T]he extent to which the Fourth Amendment protects people may depend upon *where* those people are." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998). (emphasis added).

A private hospital room where a patient who is not under arrest and is seeking medical treatment is akin to "[t]he sacred and private nature of the houses of worship Plaintiffs attended distinguishes them from the types of commercial and public spaces in which courts have held that individuals lack a reasonable expectation of privacy." *Fazaga v. FBI*, 965 F.3d 1015, 1036 (9th Cir. 2020). This is so as a patient undergoing diagnostic tests and evaluation in a hospital, and the patient's statements made in furtherance of treatment, as they are cloaked with a reasonable expectation of privacy given a reasonable anticipation that they will not be shared with nonmedical personnel without his consent. *United States v. Motley*, 89 F.4th 777, 791 (2023) (citing *Ferguson v. City of Charleston*, 532 U.S. 67, 78 (2001)). "[A]n intrusion on that expectation may have adverse consequences because it may deter patients from receiving needed medical care." *Ferguson*, 532 U.S. at 78 n.14.

In contrast, public areas of hospitals, such as a mail rooms, are inherently commercial spaces and do not confer any expectation of privacy to its users, however. *United States v. Gonzalez*, 328 F.3d 543, 547 (9th Cir. 2003). Related, in *United States v. George, 987 F.2d 1428*, 1432 (9th Cir. 1993), the Ninth Circuit held that a defendant who was arrested and taken to the hospital by police for involuntary medical treatment to cause him to expel balloons containing narcotics that he swallowed did not have an expectation of privacy under those circumstances and that officers were authorized to search his bedpan for any items that he later expelled.

Here, Defendant had an inherent expectation of privacy in his private hospital room. He was not under arrest, but certainly not free to leave during treatment; given its nature and his expressed suicidal ideation. These conditions were known to Hannah, as is evidence by she and Defendant's wife's discussion of potentially involuntarily committing Defendant for a mental health evaluation in accordance with state law.

While not memorialized or corroborated in any fashion by Hannah, the statements Defendant allegedly made were made in the course of his acquisition of medical treatment. Hannah's presence in a location in which Defendant had standing renders her collection of evidence inherently tainted and ran afoul of the Fourth Amendment. For this reason, Defendant's statements should be suppressed.

**B.     Hannah's Actions in Defendant's Private Hospital Room were the Functional Equivalent of Interrogation**

Once Hannah entered Defendant's private hospital room for purposes of her investigation – arguably the only purpose she could have had – Defendant was not free to leave, if for no reason other than the fact that he

had an IV in his arm.  Hannah, nor any other law enforcement officer advised Defendant of his *Miranda* warnings.

"*Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent."  *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980).   *Innis* extended the definition of 'interrogation' beyond the realm of direct questioning by police and broadened it to include "actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  446 U.S. at 301.  Whether the actions of police are "reasonably likely to elicit an incriminating response from the suspect . . . focuses primarily upon the perceptions of the suspect, rather than the intent of the police."  *Id.*  But "[a]ny knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response from the suspect."  466 U.S. at 302, n.8.

Hannah had no legitimate purpose to be in Defendant's private hospital room other than to collect incriminating evidence against Defendant.  Without waiving the argument of the legal propriety of her presence, Hannah had already been told by SSA DeAndre that Defendant would not be making a statement.  Indeed, Hannah was fully aware that he had been admitted to the hospital because Defendant was having a mental health crisis and because he was verbalizing suicidal ideation.  She knew full well of Defendant's "unusual susceptibility" and his having been given medication that impaired him.  The Court should take pause with – and consider Hannah's actions –

after she was repeatedly told by hospital personnel to stay out of Defendant's private hospital room and her awareness of his vulnerability at that time.

Based on Defendant's inability to rebuff Hannah's efforts, the totality of her actions, and the fact that her actions constituted the functional equivalent of interrogation, the Court should find an independent basis to suppress Defendant's purported statements.

### C. Defendant's Statements were Involuntary

If the Court believes that Defendant did make the statements as claimed by Hannah, it should nonetheless suppress them as they were made involuntarily. There is no dispute that Defendant was unusually susceptible at the time Hannah encountered him. Likewise, there is no dispute that he did not receive Miranda warnings or that he was cognizant that an official investigation was being conducted such that he needed counsel. All he knew was that something tragic had occurred, his close friend was dead, and he was in a hospital being medicated for mental health reasons.

In addition to these factors, Defendant will adduce additional evidence at the requested Evidentiary Hearing to allow this Court to make factual determinations in support of Defendant's contentions that his statements, if made, were involuntary in nature and that they should be suppressed as a matter of law.

Respectfully submitted this 2nd day of October, 2024.

/s/ Jason D. Lamm
Jason D. Lamm

/s/ Jeffrey H. Jacobson
Jeffrey H. Jacobson
Attorneys for Defendant

**CERTIFICATE OF SERVICE**

    I hereby certify that on October 2, 2024, I electronically submitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and notice will be sent to all parties by operation of the Court's electronic filing system.

/s/ Kathryn A. Miller