**JACOBSON LAW FIRM**
570 N. Columbus Blvd., Suite B
Tucson, Arizona 85711
Telephone (520) 834-8034
Facsimile (520) 844-1011
jeff@jacobsonlawfirm.net
Jeffrey H. Jacobson, SB # 019502

**LAW OFFICE OF JASON LAMM**
2501 North Seventh Street
Phoenix, AZ 85006-1047
Telephone: (602) 222-9237
Facsimile: (602) 222-2299
jlamm@cyberlawaz.com
Jason D. Lamm # 018454
*Attorneys for Defendant*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | Case No.: 2:24-CR-00355-SPL |
| Plaintiff, | **DEFENDANT'S CLOSING ARGUMENT** |
| v. | |
| Larry Edward Brown, Jr., | |
| Defendant. | |

Ignoring, *arguendo*, Agent Hannah's staggering credibility issues and the utter absence of any objective corroboration that Defendant blurted out a statement in her presence, any declaration that Agent Hannah *claims* Defendant made in her presence was unquestionably involuntary due to Defendant's then-existing physical and emotional conditions. Therefore, it must be suppressed as a matter of law.

When IRS Supervisory Special Agent (SSA) Tina D'Andre returned to the FCI Shooting Range after learning of the shooting, she observed the Defendant in a highly emotional state, frantically pacing back and forth. Exhibit A at 106:22-23. The combination of Defendant's physical and emotional infirmities caused his legs to give out "out of

nowhere" as Defendant suddenly collapsed to the ground, ending up on his buttocks. *Id.* at 108:6-14.

Several witnesses observed that Defendant was suffering from dehydration and shock. IRS-CI management directed SSA D'Andre to transport Defendant to Sonoran Crossing Medical Center (SCMC). At the hospital, SSA D'Andre provided SCMC's medical professionals with Defendant's history because he was "in complete shock and looked out-of-it and [because] he looked emotionally and physically drained." *Id.* at 112:12-18. Defendant's initial vital signs, taken at 1:15 p.m. – just minutes after he arrived at SCMC - revealed a blood pressure of 144/99 and a heart rate of 97. This suggested Defendant was suffering from stress or dehydration. *Id.* at 67:23-68:17. Defendant's next set of vital signs, taken at 1:29 p.m., showed that his condition was worsening because his blood pressure rose to 157/101 and his heart rate elevated to 104. *Id.* at 74:12-13.

Upon arriving at the SCMC, Agent Hannah testified that she was "intercepted" by SSA D'Andre who told her that the shooting was an internal matter. *Id.* at 14:1-6. Agent Hannah "responded and corrected her" and said that "the FBI was investigating this shooting, and that [she] was the case agent." *Id.* at 14:7-10. She reiterated her role and the investigation to a nurse who supposedly also tried to stop her from talking to Defendant, telling the nurse, "I am investigating a shooting, and you cannot invoke for Mr. Brown, and **I am going to need to go speak to him**." *Id.* at 14:21 – 15:13 (emphasis added). When Agent Hannah entered Defendant's room, she said to him, "I am Special Agent Taylor Hannah with the FBI, and I am here to just discuss some things with you today about what just occurred." *Id.* at 16:1-8. Simply put, even before Agent Hannah ever laid eyes on Defendant, she knew she was the case agent investigating the shooting *and that no matter what, she intended to speak to Defendant.* Importantly, by the time she arrived at the hospital, she knew that Agent Bauer had passed. *Id.* at 33:9-14. Even before contacting Defendant in his private hospital room, Agent Hannah knew that he had been admitted for dehydration – a condition which, based on her own prior knowledge and experience, can cause headaches, feelings of faintness, and confusion and disorientation. *Id.* at 47:2-12. Agent Hannah was also aware that Defendant was treated for shock – a medical condition which she knew caused him "altered mental status". *Id.* at 47:22-23.

When she first observed Defendant in his private hospital room, Agent Hannah testified that he "was extremely distraught and upset." *Id.* at 19:2, 40:23-25. He was so distraught, his eyes were red and puffy, suggesting that he had been crying. *Id.* at 18:18-20, 40:18-20.

As nurses were coming in and out of Defendant's private hospital room, without responding to any questions that anyone asked him, Defendant "began kind of rocking. Seemed like again, he was distraught. And he repeated several times, as what I would describe as like a mantra, that he was a use of force instructor, that he should have known better, and that he teaches this. And he kept saying that over and over." *Id.* at 19:7-16, 41:16-18. Even though nurses were coming in and out, Agent Hannah was the only one in the room, and the only person to hear Defendant allegedly repeating the mantra over and over. *Id.* at 25:9-23; 40:15-18, 43:15-20.

Agent Hannah testified that Defendant uttered his mantra between 1:20 and 1:45 p.m. (approximately 1:30 p.m.) *Id.* at 42:6-9, 58:7-9. However, Defendant did not begin receiving intravenous fluids until 14:59 hours. *Id.* at 59:10-13. Thus, at the time Defendant allegedly made a spontaneous statement to Agent Hannah, he was still suffering from the effects of shock and dehydration. And because Defendant was still being assessed by hospital professionals, he had yet to receive any treatment for those conditions.

By Agent Hannah's own admission, but for the Defendant's emotional state, she would have interviewed him at the hospital. *Id.* at 53:6-9. Put another way, Agent Hannah did not interview Defendant at the time because she knew that his then-existing mental and physical conditions rendered him incompetent to make a voluntary statement.

Defendant's wife, Maelee Brown, came to SCMC and entered his room at 1:35 p.m. *Id.* at 139:5-10. Her initial observation of Defendant was that "[h]e seemed really out of it. He was very quiet, just very – like he had a flat affect." *Id.* at 142:10-12. Her professional knowledge as a pharmacist, her firsthand experience with Defendant's past medical issues, and what she immediately saw when she entered Defendant's hospital room led Mrs. Brown to believe that Defendant was dehydrated. *Id.* at 143:14-19.

Defendant's nurse, Shirlauna Miller, testified that Defendant had a "flat affect and psychomotor retardation" *Id.* at 69:3. Based her on her experience and personal observations,

3

Defendant was in shock and not thinking clearly. *Id.* at 71:19 - 72:1-3. Defendant's blood tests confirmed that he was suffering from dehydration. *Id.* at 79:23-80:1-5. Ms. Miller specifically recalled that Defendant was so withdrawn that he "really wouldn't tell us anything." *Id.* at 70:19. In fact, Mrs. Brown had to complete SCMC's basic hospital paperwork because Defendant's inability to communicate rendered him unable to complete even ministerial tasks about his own health and background. *Id.* at 147:10-22.

According to Agent Hannah, Mrs. Brown told her, "I have never seen my husband like this, and he is making suicidal statements[1] to me." *Id.* at 23:20 – 25:8. This caused agents to seek out EAP assistance for Agent Brown, and to inquire about whether he had firearms at home. *Id.*

At the time Defendant allegedly uttered this mantra, he was suffering from serious medical conditions. According to Agent Hannah, he was distraught, and his eyes were red and puffy as though he had been crying. According to Ms. Miller, Defendant's affect was flat, his face expressionless, and Defendant was not thinking clearly. *Id.* at 69:2-24, 71:19-25. His condition was "a state of shock." *Id.* at 72:1-3. In fact, Defendant was being treated for shock and dehydration, symptoms of which can include confusion, altered mental status. His vital signs were also consistent with stress and dehydration. In sum, Defendant's physical and mental conditions impacted his judgment and understanding. *See Mincey v. Arizona,* 437 U.S. 385 (1978) (statements made by patient during hospital interrogation were not voluntary). He was also, apparently, expressing suicidal ideations. Finally, it strains credibility to believe that a seasoned federal law enforcement officer such as Defendant, familiar with the criminal justice system, and with experience interviewing and interrogating subjects and suspects, would simply blurt out a statement of that nature.

The totality of the circumstances clearly demonstrates that the Government has failed to carry its burden to show that Defendant's statement was voluntary. *United States v.*

---

[1] Mrs. Brown (consistent with the medical records in evidence) denies Agent Hannah's claim about references to suicide. Solely for the purpose of Plaintiff's Motion to Suppress, Defendant accepts Agent Hannah's testimony as proof of Plaintiff's mental condition at the time.

*Heller,* 551 F.3d 1108, 1112 (9th Cir. 2009). For these reasons, Defendant respectfully requests the Court suppress Defendant's hospital room statement.

DATED this 8th day of January, 2025.

**JACOBSON LAW FIRM**

*/s/ Jeffrey H. Jacobson*
Jeffrey H. Jacobson

**LAW OFFICE OF JASON LAMM**

*/s/ Jason D. Lamm*
Jason D. Lamm
*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically transmitted the foregoing document to the Clerk of the Court by using the CM/ECF System and a copy of the filing was served on all counsel of record through the Court's CM/ECF system.

*/s/ Jeffrey H. Jacobson*
**JACOBSON LAW FIRM**