

December 16th, 2024                                              **Our File:** 2400378 Jacobson Law, USA v. Brown

Jacobson Law Firm
570 N. Columbus Blvd, Suite B
Tucson, AZ
85711

**Attention:** Jeffrey Jacobson

Dear Mr. Jacobson:

**Re:    Expert Witness testimony**

### 1.0   EXPERT WITNESS BACKGROUND

Mr. Anthony Cole has a B.S. in Fire and Safety Engineering Technology from Eastern Kentucky University and a M.S. in Fire Protection Engineering from Worcester Polytechnic Institute and is a licensed fire protection engineer and certified fire fighter/instructor.  Mr. Cole has almost 40 years of experience in the field as an engineer, consultant, leader and manger of consulting firms, and both public and private fire service entities. In the United States Mr. Cole has served in several different capacities leading and developing fire service capabilities with multiple professional agencies. Internationally, Mr. Cole has served as Fire Engineer, Fire Chief, Fire Chief Advisor and Deputy Disaster Commander with his primary focus on emergency response plans. Mr. Cole Specializes in risk management, response management, and resource management for emergency services. Mr. Cole has presented on "Emergency Response Planning" for the American Society of Safety Professionals (ASSP) (2014), "Disaster Management" for Saudi Aramco Development seminar (2012) as well as various other topics regarding the fire protection industry.  He has also been an editorial reviewer, contributing author, and author of various fire-related publications.

### 2.0   WITNESS DISCLOSURE OF FINDINGS

#### 2.1    RESPONSE DELAYS

A critical component of effective emergency response is reducing the time between the first contact with emergency services, and arrival of units and personnel on scene. For medical emergencies, this also includes transport of the patient. Rapid response is essential in the industry to providing high quality public service and care, no matter the location. In this incident, numerous moments in the sequence of response events added significant delays to response efforts and were contrary to national standards and local procedures.

### 2.1.1   Dispatch Time Delay

The National Fire Protection Association (NFPA) 1710: *Standard for the Organization and Deployment of Fire Suppression Operations, Emergency Medical Operations, and Special Operations to the Public by Career Fire Departments*, outlines the standard for emergency response times by fire departments in Emergency medical calls, as well as dispatch call receptions and transmittal. NFPA 1710 (2020 edition), Section 4.1.2.3.3.1 requires emergency alarm processing for calls requiring emergency medical dispatch questions and information gathering to be completed and transmitted within 90 seconds, 90% of the time, and 120 seconds 99% of the time[1].

Phoenix Fire Department dispatch incident information for incident number 23353830 notes the initial 911 call was taken by the dispatcher at 11:08:30 and transmitted to units for assignment at 11:13:29[2], a total processing time of 4 minutes and 59 seconds. This processing time is well above the two minutes outlined as industry standard in NFPA 1710 | 4.1.2.3.3.1. Any delay in transmitting the alarm to necessary fire and EMS units delays the time in which the patient can be contacted, care rendered, and transport to higher levels of care. In cases involving serious injuries, particularly traumatic injuries, the harm to patients is increased by virtue of the delayed response.

### 2.1.2   Distance of Fire & EMS Units to Scene

Engine 56 was dispatched as the primary Phoenix Fire Department unit assigned to the call, along with CR3 (CR Referring to "Car" 3 in dispatch logs). Daisy Mountain Fire & Medical Rescue 146 was dispatched as well on the initial assignment of units on an automatic request from the Engine 56 Captain, according to the dispatch record[2]. It is not clear from the dispatch log if it is standard practice to call Daisy Mountain Fire for EMS resources in this geographical area of response. No information has been provided for my review to indicate a mutual aid agreement between the two organizations, only the note in the dispatch log.

At the time of dispatch, Engine 56 was not located at Station 56, which is 2.1 road miles from the incident location[3]. It is not known where Engine 56 was at the time of the alarm transmission. Phoenix Fire Department dispatch logs show Engine 56 took 8 minutes and 17 second to arrive on scene[2]. Based on the Engine 56 being away from their station district, one Phoenix Fire Department station was located closer to the incident location, Station 55. Station 55 houses two units, Engine 55, and Rescue 55[3] (See Figure 1).

GPS pin data obtained from the Phoenix Fire Department through a subpoena shows Rescue 55 to be on another call at the time of this incident, located at 20003 N 23rd Ave #271, Phoenix, AZ 85027[4] (seen in figure 1). Rescue 55, which is located at the same station as Engine 55, is the only Phoenix Fire Department ambulance located in the northern area of the Phoenix Fire Department's geographic boundary of coverage[3]. There is no information as to the location of Engine 55 at the time of this incident. Station 55

---

[1] NFPA 1710, standard for the organization and deployment of fire suppression operations, Emergency Medical Operations, and special operations to the public by career fire departments. (2020). National Fire Protection Association.

[2] PFD Incident Information 2335839

[3] Fire station locations and apparatus. City of Phoenix. (n.d.). https://www.phoenix.gov/fire/about-us/locations-and-apparatus

[4] Station 55 gps information: GPS_Pins

is located 6.6 road miles from the shooting location[3]. Based on Engine 56 being out of their area of coverage, if Engine 55 was located at its station, Phoenix Fire Department Standard Operating Procedure (SOP) would require Engine 55 to respond to the scene as the closest incoming unit. Phoenix Fire Department SOP for EMS Dispatch Procedures requires the closest fire suppression will be dispatched, along with a paramedic unit to specifically defined medical emergencies, including shootings[5]. If dispatch followed departmental required procedures for EMS Dispatch, E56 would not have been dispatched to the scene, but a closer fire unit (Engine 55, if located at its station).

Phoenix Fire Department's SOP on communications stipulates selection of units be initially based on the CAD (Computer Automated Dispatch) System. The CAD recommends the closest and most appropriate units based on availability, current location, and unit capabilities[6]. While the computer sets up the initial recommendation for assignment, the call taker makes the initial judgement based on the information received from the caller[6].

Based on the information above and my training and experience, this incident was a clear departure from Phoenix Fire Department's Standard Operating Procedures. Engine 56 should not have been dispatched if they were out of their response area, and a closer unit be assigned instead. If Engine 55 was also outside of this response area, Phoenix Fire Department did not follow basic requirements of deployment to ensure that area of the city was protected by Fire or EMS units. Divergence from these procedures added to the increasing time for units to get to the incident scene to provide care.

---

[5] Phoenix Regional Standard Operating Procedures, M.P. 205.02, EMS Dispatch Procedures, Microsoft Word - 20502 revised for pdf.doc
[6] Phoenix Regional Standard Operating Procedures, M.P. 205.01, Communications, Microsoft Word - 20501.doc



Figure 1 Phoenix FD Station Location Map

### 2.1.3 Extended Response Times

Daisy Mountain Fire & Medical R146, which provided treatment and transport, was dispatched with the first initial units at 11:13:29 and responded at 11:14:05. R146 arrived on scene at 11:26:39, 12 minutes, 34 seconds in response time[2].

NFPA 1710 (2020 Ed.) | 4.1.2.1 (8) stipulates the travel time for fire department units to a medical call involving ALS (Advanced Life Support) must be less than 480 seconds (8 minutes).[1]

Both Engine 56 and Rescue 146, as the primary care units, did not respond within the time mandated by industry standards. The considerable extra time for R146 to arrive on scene delayed in transporting the patient to a higher level of care.

The assignment of Rescue 55 on another incident, an EMS unit assigned as the only ambulance in this area of fire department coverage, requiring the response of the Daisy Mountain ambulance unit (R146), is concerning as to the department's priorities in proper coverage of medical units throughout the city. Rescue 55's assignment to another incident caused the most significant delay, requiring Daisy Mount R146 to respond from a significantly farther distance.

Further, the unknown location of Phoenix Fire Department Engine 56 at the time of dispatch, which was not located in its station district area, contributed to all incoming units not meeting the acceptable response times set as industry standard by the NFPA.

### 2.1.4   Communication Delays

Dispatch information from Phoenix Fire Department further shows delays in arrival on scene regarding the location of the incident. Initial dispatch of the incident at 11:13:21 was accompanied an automatic warning for the dispatcher based on the call type stating, "VIOLENT INCIDENT IN PHX - VOICE ANY PD TACTICAL CHANNEL CHANGE"[2]. It is standard practice for emergency medical care units to wait for clearance from police before entering the scene[7].

However, during this incident, dispatch records show Unit "DS46" informed units at 11:16:23 PST "No need to Stage".  Six minutes later, unit CR3 radios unit DS35 stating " You don't respond to prisons, right?", CR3 responds "PER OUR SOP - WE NORMALLY DO NOT GO TO PRISONS BUT WERE TOLD TO SLOW ROLE [Roll] TO THE SCENE UNTIL FURTHER NOTICE"[2].

Regarding scene safety, while it is understandable at the initial call the units may respond with concern to the scene's safety based on the incident type, the clear message from DS46 informing units not to stage, but to proceed directly into the scene, negates this matter. Therefore, responding units had no reason to slow their response. Once again, this resulted in an unnecessary delay in providing critical treatment and transportation to the patient.

The message between CR3 and DS35 over the location of the incident the need to "slow role [roll]", demonstrates confusion and communication discrepancies. Firstly, the scene location was informed to units the 11:19:22[2], where dispatch informed units the located was the gun range. Secondly, the comment to "slow role [roll]" was stated after units were told not to stage. These lapses in communication create confusion, and delay, which ultimately impede timely response and patient care.

### 2.2   LACK OF INFORMATION

### 2.2.1   NFIRS Report

The National Fire Incident Reporting System (NFIRS) report filed by the Captain of Engine 56 provided substandard information on the incident itself.  The "remarks" section of the report only includes two sentences. "See Zoi for full report. R146 was transport and supportive care for E56".[8] The "Zoi report" refers to the Patient Care Report made for the patient treated and gives information on treatment and transport of the patient.

---

[7] Sanders, M. J., McKenna, K., Mejia, A., & Tan, D. K. (2025). *Sanders' paramedic textbook Mick J. Sanders; contributing editor, Kim D. McKenna ; Medical Editors, David K. Tan, Alfonso Mejia*. Jones & Bartlett Learning.
[8] OCC-NFIRS Certified Records

NFIRS reports are considered legal documents as to the actions performed by emergency service personnel at an incident as a record of what occurred. Accuracy and detail are essential in the completion of a NFRIS report. The *Essentials of Firefighting and Fire Department Operations*, published by the International Fire Service Training Association, is considered the standard in training basis for firefighters in the United State. The manual states NFIRS reports must be "Complete and written in terminology that the general public can understand"[9]. While the Captain of Engine 56 completed each of the required sections of the NFIRS in terms of filling in required spaces. The report is not written in such a manner which the public can understand, nor is it complete is describing the actions of the unit on scene. As the first arriving unit, according to the dispatch records, "providing supportive care" is not an acceptable level of detail for non-patient care actions.

Further, there is no provided NFIRS report from DMFM BC141, as a responding fire unit, the are required to complete this report as well as Engine 56. Without this report, it is not possible to understand why BC 141 was added to this call, and what they did, as one of the first arriving emergency units on the scene.

The lack of information from the NFIRS report makes it impossible to accurately understand what the Phoenix fire Department did during this incident. With extended response times, communication confusion of the scene location and safety, the NFIRS report should have provided clear information on to why these delays and confusion occurred.

### 2.2.2   Patient Care Report

Further, the Patient Care Report (PCR) for this incident was not accurate regarding times recorded. In the call times section of the PCR, the dispatched time, en route time, and on scene time are not reflective of the dispatch time information. The dispatched time and en route time are noted as 16:57:59. The on-scene time is also listed as 16:57:59. The unit clear time is marked as 17:15:58. There is no time for arrival to the hospital, or transfer of care.[10] There is no explanation for the fact that these times are about six hours *after* the initial call for service.

Further, times noted in the treatments and vitals section are listed as 12:09:11 through 12:48:05. Hospital admittance times, and police dispatch information noted the ambulance arrived at the hospital at 11:44:00[10]. Based on the PCR, the first time that Phoenix Fire Department took the patient's vital signs was almost 25 minutes after the patient actually arrived at the hospital. If true, that represents a gross deviation from the standard of care.

The inconsistencies of reporting in time create a contradiction in the timeline of response and care, which are essential to determine how the emergency response system functioned to provide high level care to the victim. Based on this PCR, and the expectation of accuracy in a PCR, the inconsistences create doubt into what the responding personnel actually did in regard to response and transport.

---

[9] Stowell, F. M., & Murnane, L. (2013). *Essentials of firefighting and fire department operations*. Brady Pub.; Fire Protection Publications.

[10] 23353830-1282787-Incident Report (Hospital)_redacted (965-970)

## 2.3  TIMELINE OF EVENTS

The following graphic (Figure 2) displays the comparison between times logged by Phoenix Fire Department dispatch logs, and the PCR from Engine 56 during this incident. The timeline shows significant discrepancies in reporting times published in the PCR, compared to the dispatch logs. Further, the dispatch logs show the extended response times for dispatch, as well as response time for apparatus.

It can also be seen when important information was transmitted to incoming units as to the scene safety, where there was no need to stage, later confusion resulting in units slow rolling into the scene. The location of the incident, stated to be at the gun range, when later confusion had some units believing it was located at the prison.

This timeline shows where critical errors in communication, resource deployment, response, and accuracy in reporting created a response which was not to the industry standards or best practices of the emergency response system.



Figure 2: Timeline of Events

## 2.4  SITE EMERGENCY RESPONSE

### 2.4.1  Air Medical Trasport

Phoenix Fire Department Standard Operating Procedure (SOP) for Air Operations stipulates air medical transport should be used for patients within city areas, when time and distance effect transport time, and when sufficient ambulances are unavailable[11]

This incident, based on Phoenix Fire Department's own SOP, should have included the use, or considered the use of air medical transport. The location of the shooting was in a remote location of the city response area, with an extended transport time via ground ambulance. Furthermore, there were no close Phoenix Fire Department ambulances available at the time of the incident, requiring an extended mutual aid response from Daisy Mountain Fire & Medical R146.

An air ambulance would have shortened the transport time to the hospital, mitigated the extended response time for a ground ambulance. Dispatch logs from Phoenix fire do not show any consideration for an air medical transport. This lack of consideration on the part of responding units for their own standard operating procedures is a direct contributing factor in the extreme extended response to this incident.

### 2.4.2  Self Transport

Time is one of the most critical functions of emergency response. The closer emergency units are located to an incident location, the faster then can respond, provide care or service, and then transport (for medical incidents). The location of the shooting range, as seen from the lengthy response from Phoenix and Daisy Mountain units, is a considerable distance from any emergency units.

In an interview summary of ICE agent Sam Hopkins, Hopkins discusses the opportunity to take the victim to the hospital using their vehicle, which they had prepared for that possibility. Agent Hopkins and others who he stated suggested the idea of self transport, was not supported by an IRS Special Agent, who was also on scene. Further, Agent Hopkins noted a chest seal had already been applied when he arrived at the scene on Range 3, and he had also brought a first aid kit.[12]

Based on the summary of Agent Hopkins testimony, self transport would have been a viable option which would have gotten the victim to the hospital far quicker than waiting for Fire and EMS units to arrive and transport.  Further, the summary shows Agent Hopkins and others had brought first aid equipment and were rendering basic aid to the victim, displaying knowledge of best practice for response to these incident types. With the availability of transport, and somewhat knowledgeable persons rendering aid, self transport would have been a viable, and considerable time saving option, in transport to a higher level of care.

---

[11] Phoenix Regional Standard Operating Procedures, M.P. 201.07, Air Operation, Microsoft Word - 20107 revised for pdf.doc

[12] 07A-PX-3082082_0000024_Redacted (01-1013-1018)

### 2.4.3 Emergency Response Planning

From a risk management and response perspective, a shooting range has a high-risk potential for shooting related injuries, including gunshot wounds. Even if the individuals using the range are trained in the use of firearms, The risk of an incident occurring is not diminished. Controlling and reducing these incidents is possible through an emergency response plan.

Emergency response plans outline critical responsibilities, procedures, and expectations of all persons at the facility during an emergency event. For a shooting range, these include the responsible person(s) who will contact 911, the location of medical equipment (as well as the person(s) who will initiate care), protocols for self transport, guiding emergency units to the scene (both ground and air transport), as well as contact and location information for local hospitals capable of handing traumatic injuries.

Emergency response plans must be disseminated to all those who use the facility and be trained on frequently with all players involved in the plan in order for it to function as designed. For those using the range, lack of understanding as to the safety protocols, and response procedures increases the likelihood of an incident occurring, and missteps in response to an incident.

Testimony from those present at the range during the shooting does suggest there was knowledge of the best practices for these situations, in regard to self transport, but no discussion of any range specific plans was discussed or enacted.  Further, the range master was not present at any point during the incident, nor is it stated if a range safety official was on scene.

If the FCI range had an accepted, practiced, and informed emergency response plan in place, and it was followed, the delays in transport, and miscommunication among emergency personnel, would have likely not occurred.

### 3.0   UNRESOLVED DEFICIENCIES

**What was the location of Engine 56?**

There is no substantive evidence from any provided documents as to the location of PFD E56 when the call was dispatched to units. Only hearsay evidence that E56 was at the Hospital. The time taken for E56 to respond to the scene is less than then time it took R146 to respond to the hospital (with a police escort). The specific location of E56 is needed to give support to any delay in response which may have occurred.

**What was the location of PFD E55?**

GPS information provided did not indicate the Unit as Engine 55, but as Rescue 55. Statements as to the location of E55 are not supported by evidence provided. The location of E55 is needed to support any necessary oversight in dispatching a closer fire unit.

**What are the other units assigned to the incident, why were they assigned?**

Car 959, "NDC", and DS 35 are units who were added to the call as the incident unfolded, these units impacted response delay by communicating information which may have confused other incoming units, in particular having units "slow role [roll]" into the scene.


Kind Regards,

**Senez Consulting Inc.**

Per:

*[signature]*

Anthony R. Cole, P.E.