**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-24-00355-001-PHX-SPL |
| Plaintiff, | |
| vs. | **ORDER** |
| Larry Edward Brown, Jr., | |
| Defendant. | |

Before the Court is Defendant's Motion to Suppress Statements (Doc. 50), the Government's Response (Doc. 51), and Defendant's Reply (Doc. 52). On December 19, 2024, this Court conducted an evidentiary hearing on the Motion. The Court requested that the parties submit written closing arguments by January 8, 2025, and it is also in receipt of those supplemental papers (Docs. 105, 106).

**I.    BACKGROUND**

This Motion to Suppress concerns statements (the "Hospital Statements") allegedly made by Defendant to FBI Special Agent Taylor Hannah ("SA Hannah") while Defendant was being treated at a hospital for shock following the shooting of his fellow agent. Specifically, SA Hannah allegedly heard Defendant state, "I am a Use of Force Instructor. I should know better. I teach this." (Doc. 50 at 3). At the December 19, 2024 evidentiary hearing, various witnesses recounted the events at the hospital following the shooting, and the pertinent facts are summarized as follows.

### 1. Underlying Shooting Incident

This case arises over the events that occurred on August 17, 2023, when Defendant Larry Edward Brown, Jr. ("Defendant") is alleged to have caused the death of his co-worker, fellow IRS Special Agent Patrick Bauer. (Doc. 5 at 1–2). On that date, Special Agents of the Internal Revenue Service Criminal Investigation ("IRS-CI") were using a firearm range at the Federal Correctional Institution Phoenix for "standard pistol qualifications and classroom training." (*Id.* at 1). It was notably hot that day, so training started at approximately 7:00 a.m. and ended at approximately 11:00 a.m. (Doc. 102 at 104). After training concluded, Defendant and Special Agent Bauer were observed together in "the Tower," which is "a small, one-room structure, with an interior measuring approximately eight feet by nine feet." (Doc. 5 at 3–4). Another IRS-CI agent "entered the Tower to cool off, noted that Brown and Special Agent Bauer were the only other occupants, and observed Brown using his cell phone, which prompted the other agent to leave the Tower to retrieve his own phone." (*Id.* at 5). "Seconds after exiting the tower, that same agent saw Brown run out of the tower and heard him yell 'I fucked up, I shot Pat!'" (*Id.*). Defendant called 9-1-1 at 11:08 a.m. (Doc. 51 at 2). Special Agent Bauer was transported by ambulance to a nearby hospital where he subsequently died. (Doc. 5 at 5). "After the ambulance carrying Special Agent Bauer left the scene, Brown was transported by another IRS-CI agent to a different hospital and treated for shock." (*Id.*).

### 2. Transport and Treatment at Hospital

The IRS-CI agent in question, IRS Supervisory Special Agent Tina DeAndre ("SSA DeAndre"), worked in the same office as Defendant (Doc. 102 at 103) and participated in the same August 17 firearms training, after which she went to lunch with some other agents (*Id.* at 106). While at lunch, she received a phone call that a shooting had taken place and she returned to the range, where she observed Defendant "walking back and forth, like pacing back and forth, on the phone" before he suddenly "fell down on the ground from a standing position," which caused SSA DeAndre concern. (*Id.* at 106–07). SSA DeAndre then transported Defendant to Sonoran Crossing Medical Center to be evaluated for shock.

(*Id.* at 107–08).

According to medical records and SSA DeAndre's testimony, Defendant was roomed at approximately 1:12 p.m., and a nurse assessed Defendant at approximately 1:29 p.m. (*Id.* at 111, 113). The treating nurse described Defendant as presenting with a flat, expressionless affect. (*Id.* at 69). Sometime thereafter, SSA DeAndre encountered SA Hannah arriving at the hospital as part of an FBI investigation into the shooting incident. (*Id.* at 117–18). Although SSA DeAndre questioned "why FBI was there," she was allegedly told by SA Hannah that the FBI was taking over the investigation because it "happened on federal property." (*Id.* at 118). SSA DeAndre does not recall accompanying SA Hannah into Defendant's hospital room after she arrived. (*Id.*). Defendant's wife arrived at the hospital around 1:45 p.m., at which point SA Hannah "left the room to give them time to talk." (Doc. 51 at 3; Doc. 102 at 123). During his stay at the hospital, Defendant was treated for an acute stress reaction. (Doc. 50 at 2). He was given intravenous fluids, anti-nausea medications, and later a benzodiazepine after he was informed that Special Agent Bauer had passed away. (*Id.*).

SA Hannah's recounting of events varies slightly. SA Hannah approximates that she arrived at the hospital around 1:20 p.m. (Doc. 102 at 33). She was allegedly intercepted by SSA DeAndre as well as a hospital nurse on the way to Defendant's room and was told that it would be inappropriate for SA Hannah to speak with Defendant; nonetheless, SA Hannah proceeded to Defendant's room. (*Id.* at 14–15). SA Hannah testified that when she first walked into his room, she "observed that his face was red and puffy," like he "had probably been crying a lot." (*Id.* at 18). "As the nurses were coming in and out" of the room, SA Hannah contends that "he began kind of rocking" like "he was distraught." (*Id.* at 19). Without being asked any questions, Defendant "repeated several times, as what I would describe as like a mantra, that he was a use of force instructor, that he should have known better, and that he teaches this." (*Id.*). Shortly thereafter, SA Hannah told Defendant that she would like to give him her contact information so they could sit down and talk within the next couple of days, and he took down her cell phone number. (*Id.* at 19–20).

3

SA Hannah contends that Defendant's wife arrived after she gave Defendant her phone number or "[a]round that time." (*Id.* at 21). Although SA Hannah included most of this information in the initial narrative report she drafted for the FBI on August 25, 2023, it was only in a second written report authored on August 31, 2023 that she added the detail that Defendant had made the Hospital Statements at issue here. (Doc. 50 at 3). There is no mention of the Statements in the August 25 report, and "[i]t appears that the statements . . . were not recorded or otherwise contemporaneously memorialized." (*Id.* at 4).

## II. DISCUSSION

Defendant's Motion to Suppress (Doc. 50) argues that the Hospital Statements should be suppressed on three primary grounds: (1) Defendant had a reasonable expectation of privacy in his hospital room, so SA Hannah's presence ran afoul of the Fourth Amendment; (2) SA Hannah's actions were the functional equivalent of an interrogation, yet Defendant was not given the requisite *Miranda* warnings; and (3) Defendant's Hospital Statements were involuntary. (Doc. 50 at 5–8). The Court will now address each argument in turn.

### A. Fourth Amendment Claim

First, Defendant argues that he had a reasonable expectation of privacy within his hospital room such that he may invoke the protections of the Fourth Amendment. (Doc. 50 at 5). Although Defendant raises this argument in his Motion to Suppress, it was not addressed during the December 19 evidentiary hearing, nor do either of the parties address the Fourth Amendment argument in their written closing arguments (*see* Docs. 105, 106).

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. "Before the court analyzes whether a search or a seizure is reasonable or unreasonable, there must first be a 'search' or a 'seizure.'" *United States v. Matau*, 191 F. Supp. 2d 1173, 1180 (D. Haw. 2002) (citing *Yin v. State of California*, 95 F.3d 864, 874 (9th Cir. 1996)). A consensual encounter with law enforcement does not constitute a seizure and does not implicate the Fourth Amendment. *Id.*; *see also Johnson v. City of L.A.*,

2018 U.S. Dist. LEXIS 225465, at *16 (C.D. Cal. Dec. 14, 2018) ("An encounter based on consent does not constitute a search or seizure governed by the Fourth Amendment.").

The Supreme Court has held that a "seizure" within the meaning of the Fourth Amendment occurs "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* The Court has added that "when a person 'has no desire to leave' for reasons unrelated to the police presence, the 'coercive effect of the encounter' can be measured better by asking whether 'a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.'" *Brendlin v. California*, 551 U.S. 249, 255 (2007) (quoting *Florida v. Bostick*, 501 U.S. 429, 435–36 (1991)).

Here, Defendant has failed to establish that a seizure occurred. The mere presence of SA Hannah in Defendant's hospital room is not enough to suggest that a reasonable person in Defendant's position would not have believed he was not free to leave. SA Hannah testified, and Defendant does not dispute, that he was not under arrest on that date. (Doc. 102 at 30; Doc. 50 at 6). Furthermore, SA Hannah testified that when she first proceeded to Defendant's hospital room, the door was cracked; she knocked on it and introduced herself; and Defendant "nodded at [her] and said, 'I know who you are,'" after which SA Hannah entered the room. (Doc. 102 at 16). The evidence and testimony on the record all suggest that SA Hannah's presence in Defendant's room was a consensual encounter. Merely being approached by law enforcement and asked a few questions is not enough to establish a seizure. *See Mendenhall*, 446 U.S. at 555 ("The respondent was not seized simply by reason of the fact that the agents approached her, asked her if she would show them her ticket and identification, and posed to her a few questions. Nor was it

enough to establish a seizure that the person asking the questions was a law enforcement official."). Although one of the treating nurses testified that it was "disconcerting" that SA Hannah retained her weapon while in the hospital, there is no evidence that she ever displayed the weapon in any threatening manner such that Defendant would not have felt free to leave the room. (*Id.* at 78).

Additionally, as the Court noted in *Bostick*, "the mere fact that [the defendant] did not feel free to leave . . . does not mean that the police seized him." 501 U.S. 429 at 436. In *Bostick*, the defendant was seated on a bus that was scheduled to depart when he was approached by police, and he would therefore "not have felt free to leave the bus even if the police had not been present." *Id.* Nonetheless, the fact that his status as a passenger on the bus inevitably "confined" his movements "says nothing about whether or not the police conduct at issue was coercive." *Id.* Similarly, here, the fact that Defendant was ostensibly "confined" to a hospital bed for treatment does not establish that he was in any way detained. The fact that Defendant implicitly assented to SA Hannah entering the room and speaking to him (by nodding and stating "I know who you are,") and later agreed to take SA Hannah's contact information strongly suggests that a reasonable person in Defendant's position would have felt free to terminate the exchange with SA Hannah. (Doc. 102 at 16, 19). Furthermore, at no point was Defendant ever handcuffed or physically restrained, which suggests that Defendant would have been free to leave the hospital—albeit potentially against medical advice—if he had chosen to. (*Id.* at 99).

Nor could SA Hannah's entrance into Defendant's hospital room be considered a "search" within the meaning of the Fourth Amendment. Even assuming, *arguendo*, that her presence in the room constituted a search, "the Court cannot find a Fourth Amendment violation where [the] Defendant consent[ed] to [the agent's] presence." *United States v. John*, 2014 U.S. Dist. LEXIS 86369, at *23 (D. Ariz. June 24, 2014). Because no search or seizure occurred, and because Defendant consented to SA Hannah entering his hospital room, the Fourth Amendment provides the Defendant no grounds to suppress the statements at issue.

**B. Interrogation**

Next, Defendant argues that SA Hannah's actions in Defendant's hospital room were "the functional equivalent of interrogation," and because Defendant was not apprised of his *Miranda* rights prior to that interrogation, the Hospital Statements must be suppressed. (Doc. 50 at 6–8). A suspect to a crime must be informed of their *Miranda* rights if they are subject to a custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Whether a person is in custody for *Miranda* purposes turns on whether there is a formal arrest or restraint on freedom of movement. *United States v. Crawford*, 372 F.3d 1048, 1059 (9th Cir. 2004). "This inquiry requires a court to examine the totality of the circumstances from the perspective of a reasonable person in the suspect's position." *Id.* Factors influencing the Court's determination "include the language used by the officers, the physical characteristics of the place where the question occurs, the degree of pressure applied to detain the individual, the duration of the detention, and the extent to which the person was confronted with evidence of guilt." *United States v. Butler*, 249 F.3d 1094, 1099 (9th Cir. 2001).

For similar reasons that Defendant failed to establish a seizure occurred, Defendant has also failed to establish that the Hospital Statements were the result of a custodial interrogation. Setting aside Defendant's disputes about the credibility of SA Hannah and his contention that Defendant never made the statements at issue (Doc. 106)[1], it is clear that if such statements were made, they were neither made while Defendant was in custody nor while Defendant was being interrogated. As previously discussed in relation to Defendant's Fourth Amendment argument, it is undisputed that no arrest was made on August 17; furthermore, there was no meaningful restraint on Defendant's freedom of movement, as he had not been formally detained, nor did any person indicate that he legally

---

[1] For purposes of this Order, the Court only addresses the three bases on which Defendant moves to suppress the statements at issue: the Fourth Amendment argument, the *Miranda* argument, and the voluntariness argument. Defendant's broader arguments regarding the credibility of SA Hannah's testimony and disputes about whether the statements at issue were ever made in the first place are beyond the scope of this suppression motion and better reserved for the jury at trial.

7

could not leave the hospital. Defendant never asked either of the FBI agents at the hospital that day, SA Hannah and Special Agent Roberts, if he was under arrest or if he was free to leave. (Doc. 102 at 30, 166). Given Defendant's experience and sophistication as an IRS Special Agent, it is likely that he would have asked such questions if he believed, at any point during his hospital stay, that he was under arrest or otherwise legally restrained. Instead, Defendant allowed SA Hannah to enter his hospital room, answered her questions about whether he was armed, and later agreed to take down her contact information. Under the totality of the circumstances from the perspective of a reasonable person in Defendant's position, he was not in custody. *See United States v. Norris*, 428 F.3d 907, 912 (9th Cir. 2005).

Additionally, there was no interrogation. "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). Defendant argues that SA Hannah "was fully aware that . . . Defendant was having a mental health crisis" and that he had "been given medication that impaired him." (Doc. 50 at 7). However, none of SA Hannah's words or actions were reasonably likely to elicit an incriminating response from the suspect. The only meaningful question she asked him on August 17 was whether he was armed, which falls within the public safety exception to the *Miranda* requirements contemplated in *Quarles*. *See New York v. Quarle*s, 467 U.S. 649, 655–56 (1984). SA Hannah's mere presence in the hospital room, without asking any questions or making any threatening gestures, simply does not constitute an interrogation. According to SA Hannah's testimony, the alleged statements were made "[a]s the nurses were coming in and out" and she was "trying . . . to stay in the back part of the room and not interfere," at which point Defendant allegedly "began kind of rocking" and repeating "like a mantra[] that he was a use of force instructor, that he should have known better, and that he teaches this." (*Id.* at 19). The alleged statements were made spontaneously, not in response to any words or actions on

8

SA Hannah's part, and therefore not in response to any interrogation.

Because no custodial interrogation occurred, admission of the alleged statements does not run afoul of Defendant's *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436, 478 (1966) ("Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence . . . . Volunteered statements of any kind are not barred by the Fifth Amendment . . . .").

### C. Voluntariness

Finally, Defendant argues that the alleged statements should be suppressed because if Defendant did make the statements, they were made involuntarily. (Doc. 50 at 8). In particular, Defendant argues that he was "unusually susceptible at the time Hannah encountered him." (*Id.*). Ample evidence of Defendant's emotional shock and physical dehydration was presented at the December 19 hearing. (*See* Doc. 102 at 68–69, 74–75, 79–80). SA Hannah also testified that after "observing his mental state" at the hospital, she decided not to ask Defendant to come to the FBI office that day for an interview. (*Id.* at 53). Defendant argues that "[p]ut another way, Agent Hannah did not interview Defendant at the time because she knew that his then-existing mental and physical conditions rendered him incompetent to make a voluntary statement." Whatever SA Hannah's opinion of Defendant's mental state may have been on August 17, his mental and emotional status, as documented by the witnesses and reflected in the medical record, does not render his alleged statements involuntary.

Voluntariness must be determined based on the totality of the circumstances. *Withrow v. Williams*, 507 U.S. 680, 693 (1993) ("[C]ourts look to the totality of circumstances to determine whether a confession was voluntary."). Factors relevant to the question of voluntariness include the degree of police coercion; the length of interrogation, its location, and its continuity; and the defendant's maturity, education, physical condition, and mental health. *Id.* Here, Defendant essentially argues that his compromised physical, mental, and emotional state—caused by a combination of shock due to the shooting incident and dehydration due to the extreme heat on August 17—is enough to render his

statements involuntary in nature. It is true that courts can consider a defendant's "reduced mental capacity" because it can render the defendant "more susceptible" to coercion. *United States v. Preston*, 751 F.3d 1008, 1020 (9th Cir. 2014). However, a statement will not be considered involuntary so long as it is "the product of a rational intellect and a free will." *United States v. Springfield*, 2023 U.S. App. LEXIS 16473, at *2 (9th Cir. June 29, 2023) (citations omitted). Numerous cases, for example, have found confessions voluntary even where a defendant was intoxicated or suffering the effects of drug withdrawal, so long as the defendant was "reasonably lucid" and "responsive." *See id.*; *see also, e.g.*, *United States v. Davis*, 860 F. App'x 533, 534 (9th Cir. 2021) (finding that even though the defendant "testified that he was high during the interview, no record evidence indicates his drug use made him particularly vulnerable to coercion"); *United States v. Coleman*, 208 F.3d 786, 791 (9th Cir. 2000) (finding that symptoms of heroin withdrawal did not render statements involuntary). Although Defendant was neither intoxicated nor experiencing drug withdrawal here, these cases illustrate the low threshold for courts to find a statement voluntary.

Furthermore, Defendant's argument ignores the other crucial component of voluntariness: the extent and nature of police coercion. *See Colorado v. Connelly*, 479 U.S. 157, 165 (1986) ("[W]hile mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry."). As the Government argues, "[c]oercive police activity is 'a necessary predicate' to finding a confession involuntary." (Doc. 51 at 5 (citing *Connelly*, 479 U.S. at 167)). Defendant was not subject to coercive interrogation tactics in this instance—as previously discussed, he was not in custody or otherwise detained at all. *See Connelly*, 479 U.S. at 163 n.1 (collecting cases describing police overreach); *cf. Preston*, 751 F.3d at 1026–28 (finding statement involuntary where mentally impaired defendant was repeatedly questioned, misled, and told he could not leave until he finished answering their questions). The fact that Defendant was indisputably shocked and dehydrated if and when the alleged Hospital Statements were made does not render them

involuntary, especially where no coercive law enforcement conduct occurred.

### III. CONCLUSION

None of the three arguments advanced by Defendant provide grounds for this Court to suppress the Hospital Statements at issue. To the extent that Defendant seeks to more broadly undermine SA Hannah's credibility and dispute the veracity of the statements themselves, Defendant is welcome to present relevant evidence and arguments to the jury at trial.

Accordingly,

**IT IS ORDERED** that the Motion to Suppress Statements (Doc. 50) is **denied**.

Dated this 15th day of January, 2025.

Honorable Steven P. Logan
United States District Judge